UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
                                    :
UNITED STATES OF AMERICA            :
                                    :
              -v-                   :    12 Cr. 136 (CS)
                                    :
NICHOLAS A. SPANO,                  :
                                    :
              Defendant.            :
                                    :
------------------------------------x


## GOVERNMENT'S SENTENCING MEMORANDUM


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America


PERRY A. CARBONE
JASON P.W. HALPERIN
Assistant United States Attorneys
     - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
                                   :
UNITED STATES OF AMERICA           :
                                   :
            -v-                    :        12 Cr. 136 (CS)
                                   :
NICHOLAS A. SPANO,                 :
                                   :
            Defendant.             :
                                   :
----------------------------------x

### GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this Memorandum in connection with the sentencing of the defendant Nicholas A. Spano, now scheduled for June 18, 2012 at 3:30 p.m.

This Memorandum addresses the factors to be considered by the Court in imposing an appropriate sentence pursuant to Title 18, United States Code Section 3553(a), and responds to certain sentencing arguments advanced by the defendant.[1]

As discussed below, Spano has acknowledged that he engaged in a criminal scheme to obstruct the Internal Revenue laws that lasted over at least an eight-year period. For the reasons set forth below, and particularly because of the nature and length of Spano's scheme as well as the strong need for general deterrence, a sentence of imprisonment at the high end of the advisory Guidelines range of 12 to 18 months is warranted – i.e., a sentence of 18 months' imprisonment.

---

[1]     "Def't. Mem." refers to the defendant's Sentencing Memorandum.

## I.   THE OFFENSE CONDUCT

### A.   Background

As reflected in the presentence investigation report ("PSR"), Nicholas Spano served in the New York State Assembly from 1979 through 1986. (PSR ¶ 6).  Spano was thereafter elected to the New York State Senate, where he served from 1986 through 2006. (PSR ¶ 6).  As a State Senator, Spano represented the 35th Senate District, which covered much of Westchester County. (PSR ¶ 6).  During his State Senate career, Spano served on the Rules, Transportation, Finance, Education, Health, Racing, Gaming, and Wagering Committees, chaired the Senate Investigations Committee, and was the Senior Assistant Majority Leader. (PSR ¶ 6).  Spano was also responsible for voting on and approving the operating budget of the State of New York, a portion of which included funding state agencies operations such as the New York State Office of General Services ("OGS"). (PSR ¶ 8).

The OGS was headquartered in the State Capitol in Albany, New York.  Among other functions, the OGS provided centralized procurement services for the state government agencies it supported, including the procurement of insurance needed for state government activities. (PSR ¶ 7).

As further reflected in the PSR, there was an insurance brokerage company ("Insurance Company 1") headquartered in White Plains, New York that provided insurance brokerage and related

2

services to New York State through a contract with OGS. (PSR ¶ 9).

ONAPS, Inc. ("ONAPS"), which later changed its name to HVM Corp. ("HVM"), was a corporation with a Post Office box in Albany as its listed address and which Spano controlled. ONAPS had no employees or offices and was used almost exclusively to receive money paid to Spano by Insurance Company 1 from at least 1996 through 2008. (PSR ¶ 10).

From at least 2003 through the present, 221 Ridge Ave. Corp. ("221 Ridge") was a real estate holding company created and wholly owned by Spano for the purpose of owning a two-family rental property located at 221 Ridge Avenue, Yonkers, New York. (PSR ¶ 11). As subchapter S corporations, HVM and 221 Ridge were required to file federal tax returns and report accurately the companies' annual income and expenses on Internal Revenue Service ("IRS") Forms 1120S. (PSR ¶ 11).

**B.  The Scheme To Obstruct**

Beginning in about 2000 and continuing up through 2008, Spano engaged in a course of conduct calculated to impede and impair the due administration of the Internal Revenue Laws by obstructing and frustrating the lawful function of the IRS in assessing and collecting United States income taxes. (PSR ¶ 12). Among other ways, Spano impeded the IRS by: (1) transferring income he received from Insurance Company 1 to 221 Ridge, which

income was falsely characterized as rental payments in order to reduce Spano's reported income from Insurance Company 1; (2) intentionally failing to report to the IRS a $45,000 commission payment he received on the sale of a commercial property located in White Plains, New York; and (3) intentionally failing to report to the IRS certain cash rental payments he received from tenants at 221 Ridge Avenue, Yonkers, New York. (PSR ¶ 12).

### 1.   Payments to Spano by Insurance Company 1

Beginning in about 1993, Insurance Company 1 began to pay Spano a monthly fee of approximately $1,500 to act as an outside consultant for Insurance Company 1. (PSR ¶ 13). Insurance Company 1 paid Spano a flat biweekly or monthly fee through various corporate entities, including ONAPS and HVM.[2] (PSR ¶ 13).

After Spano was hired as a consultant for Insurance Company 1, OGS awarded Insurance Company 1 a lucrative contract to become the broker of record for New York State through OGS. (PSR ¶ 14).   Accordingly, Insurance Company 1 began receiving a two-percent commission on all insurance policies written on the New York State properties and facilities that OGS managed. (PSR ¶ 14).   Insurance Company 1 made fixed monthly payments to Spano

---

[2]    According to witnesses interviewed during the investigation, the payment of commissions to outside salespeople are typically tied to commissions generated on specific accounts and not a flat fee.

from the time he was hired in or about 1993 through 2008, at which time Insurance Company 1 ceased serving as OGS's broker of record. (PSR ¶ 15).

The flat rate commissions paid to Spano steadily increased over time when the contract was extended or renewed. Beginning in or about December 1996, contemporaneous with the award of the broker-of-record contract by the State of New York to Insurance Company 1, Insurance Company 1's payments to Spano increased to $5,000 per month. (PSR ¶ 16).  In or about 1999, after the contract had been extended, Insurance Company 1's payments to Spano increased to $6,000 per month. (PSR ¶ 17).

On March 7, 2002, Insurance Company 1's payments to Spano through HVM increased from $6,000 to $8,333.33 per month, which equates to $100,000 per year. (PSR ¶ 18).

### a.  Spano's Concealment of Payments by Insurance Company 1

Because he was a sitting New York Sate Senator, Spano took various steps to conceal the amount of income he received from Insurance Company 1. (PSR ¶ 20).  As a New York State Senator, Spano was required by law to submit, and did in fact submit, financial disclosure statements to the Legislative Ethics Commission annually disclosing financial information for the previous calendar year. (PSR ¶ 20).  Spano filed financial disclosure forms for the following years that falsely reflected the amount of income Spano received from Insurance Company 1:

| Reporting Period | Amount Disclosed | Amount Received |
|---|---|---|
| 2001 | -0- | $85,475 |
| 2002 | -0- | $85,923 |
| 2003 | Between $5,000 and $20,000 | $109,996 |
| 2004 | Between $5,000 and $20,000 | $91,666 |
| 2005 | Between $5,000 and $20,000 | $108,333 |

Consistent with his pattern of failing to disclose and underreporting the income he received from Insurance Company 1 on his financial disclosure reports, Spano filed false and misleading United States income tax returns with the IRS from at least 2004 through 2008. (PSR ¶ 21).  Although HVM reported all of the "commissions" it received from Insurance Company 1, HVM otherwise claimed false and fraudulent expenses to make it appear that HVM was a functioning entity that actually had an office and conducted business. (PSR ¶ 21).

### b. HVM's False and Fraudulent Expenses

Between the calendar years 2000 and 2008, Spano wrote checks from HVM to 221 Ridge for non-existent rental expenses totaling more than $180,000. (PSR ¶ 22).  As a result, between 2000 and 2008, HVM deducted more than $180,000 in false and

6

fraudulent rental expenses on the HVM tax returns. (PSR ¶ 22).
Because HVM had no office, each of the HVM tax returns
fraudulently underreported the company's net income. (PSR ¶ 22).

For the tax years 2000 through 2008, Spano falsely
advised his tax return preparer that HVM conducted business at
221 Ridge Avenue in Yonkers, New York, that HVM had an office at
that location, and that HVM paid rent to 221 Ridge. (PSR ¶ 23).
In fact, 221 Ridge was a run-down residential apartment building
with two occupied apartments.  Based on this false information,
Spano's tax return preparer unwittingly prepared false and
misleading IRS Forms 1120S for HVM, which returns Spano signed
under penalty of perjury and caused to be filed with the IRS.
(PSR ¶ 23).

### 2. Spano's Failure to Report a $45,000 Commission

In late 2004, Spano introduced a White Plains
commercial real estate owner to a real estate developer who was
constructing a hotel in White Plains and who wished to purchase a
building owned by the real estate owner. (PSR ¶ 24).  The real
estate owner agreed to sell the building to the real estate
developer for $1,575,000. (PSR ¶ 24).

The closing on the sale occurred on January 31, 2005,
and the seller of the building was represented at the closing by
an attorney ("Attorney 1"). (PSR ¶ 25).  At the closing, Attorney
1 received a bank check in the amount of $75,000 for attorney's

7

fees.  Shortly after the closing, Attorney 1 wrote a check from his personal bank account to Spano in the amount of $45,000 as compensation for Spano's role in arranging the sale.  Spano thereafter deposited the check into his personal bank account and never disclosed the income to his tax return preparer. (PSR ¶ 25).  Consequently, Spano's tax return preparer unwittingly prepared a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for the 2005 tax year, which return Spano signed under penalty of perjury and caused to be filed with the IRS. (PSR ¶ 25)

### 3. Spano's Failure to Report Cash Rental Receipts

Spano also received rental income from tenants who resided at 221 Ridge Avenue, Yonkers, New York. (PSR ¶ 26).  On various occasions in 2005 and 2006, Spano received from his tenants rental payments in the form of cash, which he failed to deposit or disclose to his tax preparer. (PSR ¶ 26).  Consequently, Spano caused the preparation of U.S. Individual Income Tax Returns for himself that falsely and fraudulently failed to report that rental income. (PSR ¶ 26).

## II. ARGUMENT

### A.   The Guidelines Range Is 12 to 18 Months' Imprisonment

Although no longer mandatory, the Guidelines still provide strong guidance to the Court.  *See United States* v.

8

*Booker*, 543 U.S. 220 (2005); *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, as the Supreme Court recently explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita* v. *United States*, 551 U.S. 338, 348 (2007); *see also Gall*, 552 U.S. at 46 (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). After making the initial Guidelines calculation, a sentencing judge must then consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in Section 3553(a)(2).

The Probation Office calculated the advisory Guidelines range as follows: The November 1, 2011, edition of the Sentencing Manual applied. (PSR ¶¶ 31-41). Because the violation of Title 26, United States Code, Section 7212(a) involves tax loss, the offense level was calculated pursuant to

9

U.S.S.G. Sections 2T1.1(a)(1) and 2T4.1(E). (PSR ¶ 32). Because
the total tax loss was greater than $30,000 but not more than
$80,000, the base offense level under U.S.S.G. Sections 2T1.1,
2T4.1(E) is 14. *Id*. Because the defendant failed to report
income exceeding $10,000 in a single year from criminal activity,
2 levels are added pursuant to U.S.S.G. Section 2T1.1(b)(1).
(PSR ¶ 33). The total offense level is therefore 16. (PSR ¶ 37).
Because Spano accepted responsibility for his conduct and entered
a timely guilty plea, three levels are subtracted for acceptance
of responsibility resulting in an adjusted offense level of 13,
with a corresponding guidelines range of 12-18 months. (PSR ¶
38).

### B.   Defendant Spano Should Be Sentenced at the High End of The Guidelines Range, i.e., to 18 Months' Imprisonment

Under Section 3553(a), "[t]he [c]ourt shall impose a
sentence sufficient, but not greater than necessary, to comply
with the purposes" of sentencing. 18 U.S.C. § 3553(a). Those
purposes are "(A) to reflect the seriousness of the offense, to
promote respect for the law, and to provide just punishment for
the offense; (B) to afford adequate deterrence to criminal
conduct; (C) to protect the public from further crimes of the
defendant; and (D) to provide the defendant with needed
educational or vocational training, medical care, or other
correctional treatment in the most effective manner." 18 U.S.C.
§ 3553(a)(2). In determining that sentence, this Court must

10

consider "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), "the kinds of sentences available," § 3553(a)(3), the Guidelines and Guideline range, § 3553(a)(4), the Guidelines' policy statements, § 3553(a)(5), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), and "the need to provide restitution to any victims of the offense," § 3553(a)(7).

Here, an analysis of the Section 3553(a) factors counsels that the Court should reject the defendant's plea for the minimum possible sentence in the advisory Guidelines range and instead sentence Spano at the top end of the range.

### 1.   The Nature and Circumstances of the Offense

Defendant Spano committed serious offenses in all respects. This factor alone warrants a sentence at the high end of the Guidelines range. This was not at all the case where, for example, a political aide made a relatively isolated mistake in a misguided effort to protect the boss. In short, the case at bar stands in stark contrast to that of *United States* v. *Raymond Maguire*, 11 Cr. 777 (CS), where this Court recently sentenced former State Senator Vincent L. Leibell III's staffer to four months in prison after he pled guilty to a single count of obstruction of justice. In that case, the Court gave Maguire a

sentence below the Guidelines range largely because of his exemplary personal history, including most notably, his military service, but also because the Court found that Maguire's criminal conduct was aberrant, relatively isolated, and was done in blind, misguided loyalty to the principal.

Like Maguire, Senator Spano faces the same advisory Guidelines range of 12 to 18 months' imprisonment. But unlike Maguire, none of the mitigating facts present in Maguire's case are present here. The criminal conduct here was by the Senator himself, the principal, who engaged in this conduct for a very long period of time. In doing so, Senator Spano misused his office for personal gain. His scheme to obstruct the Internal Revenue Laws could only be carried out by his repeatedly lying on his State Senate financial disclosure forms. As a veteran public official, Senator Spano knew well that the whole point of financial disclosure forms is to tell the truth and to ensure that our elected officials fully disclose any financial interests to the public. Such disclosures help avoid conflicts of interest and ensure that public officials act for the public good, rather than their own personal gain.

Over at least an eight-year period, the defendant repeatedly mischaracterized income he received from an insurance company doing business with New York State. Year after year, Spano filed false sworn statements with the Internal Revenue

12

Service - totaling at least 15 false returns over just a five-year period - and year after year he submitted false financial disclosure forms with the State of New York.  Spano filed these false returns, among other reasons, to conceal from the public his receipt of the very substantial "commissions" he was receiving from Insurance Company 1.  A description of defendant Spano's corrupt conduct is detailed at length in the PSR and the Information to which he pled guilty, as well as the Government's proffer of proof made during the plea hearing. (PSR ¶¶ 2-27).

As reflected in the PSR, the offense conduct was not a single, isolated criminal occurrence.  Rather, Spano engaged in this criminal conduct after significant planning and over a lengthy period of time.  Over many years, the defendant filed numerous false tax returns to disguise his receipt of commissions from Insurance Company 1, among other income.

Spano -- an educated, seasoned politician, successful businessman and lobbyist who had been active in and around politics most of his life -- bears sole responsibility for his words and actions.  He voluntarily, affirmatively, and repeatedly filed federal income tax returns that were false in at least three separate ways.  That he so blithely disregarded the law particularly when he was as well-equipped as anyone to know that what he was doing was criminal, strongly militates in favor of a sentence at the top of the Guidelines range.

13

It is also important to stress that while the PSR makes clear that Senator Spano has done very well financially since leaving office at the end of 2006, most of his criminal conduct occurred while he was still in office, when his income was not nearly as substantial, and when he had more of a financial motivation to maintain and protect the monies he was earning from Insurance Company 1.

## 2. History and Characteristics of the Defendant

A sentence at the higher end of the Guidelines is also supported by "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). As noted above, defendant Spano was a highly successful businessman, an insurance broker, a court arbitrator, and a veteran politician. Notwithstanding his background and expertise, he engaged in a continuous, long-term course of criminal conduct. As the defendant was filing false federal and state income tax returns year after year and avoiding his obligations as a taxpayer, he was simultaneously negotiating, debating and voting on how the State of New York should be spending the limited resources it received. The defendant's hypocrisy, i.e., committing the instant offense while serving as a high-level elected official, has -- once again -- caused incalculable loss by the public in its views on the integrity of their public officials.

Not surprisingly, the defendant has been able to muster a substantial number of letters from his friends and family and those whom he has helped in the past.  While the Court of course can consider these letters, the voices of those who have been betrayed and disappointed by Senator Spano's conduct -- arguably all the citizens of New York State and particularly the residents and voters of the defendant's Senate district -- also must be considered.  While these voices may not be as loud and while these citizens may have grown too jaded or dispirited to write letters, they no doubt would tell this Court, as they shake their heads, that they cannot believe that yet another elected official has betrayed the public trust in order to line his own pockets.

### a.   *Public Service and "Good Deeds"*

The defendant's sentencing submission provides numerous examples of prior good deeds the defendant did while a public official.  *See* Def't Mem. at pp. 5-25.  To further highlight the defendant's reputation in the community, defense counsel submitted numerous newspaper articles to the probation officer as evidence of the public's favorable views toward the defendant.  (PSR ¶ 75.)  To the extent that the defense relied on favorable newspaper articles to define Mr. Spano's reputation, such selective reliance paints only a partial picture of the defendant.  Like many public officials, Mr. Spano has been the

15

subject of many news reports – some favorable and some far less

so.  *See, e.g.*:

Jonathan Bandler, *Annabi Trial: Mangone Says Lie Protected Nick Spano*, JOURNAL NEWS, Mar. 2, 2012; Op-Ed, *Albany's Favorite Felon*, N.Y. POST, Feb. 15, 2012, at 28; *Judge in Yonkers Corruption Trial Allows Evidence Involving Nick Spano, Al Pirro*, JOURNAL NEWS, Feb. 15, 2012; Michael Powell, *Tracking the Tentacles of Corruption*, N.Y. TIMES, Feb. 13, 2012; Kenneth Lovett, *Booze, Guns, Cigars All Part of Spano Strategy*, N.Y. POST, Oct. 24, 2006, at 2; Phil Reisman, *Meet Spano's Latest Bedfellow*, JOURNAL NEWS, Aug. 4, 2009, at 1b; Phil Reisman, Editorial, *Spano for Sale*, N.Y. POST, June 19, 2006, at 26; Phil Reisman, *Patronage Trail Always Leads to Nick Spano*, JOURNAL NEWS, Mar. 1, 2012; Phil Reisman, *Follow the Money Trail through these Prominent Yonkers Families*, JOURNAL NEWS, Apr. 8, 2007, at B1; Yancey Roy, *Clubs, Clowns, Drain Campaign War Chests*, TIMES UNION (ALB.), May 28, 2000, at C7; Michael Gannon, *Nick Spano's Campaign Cash Paid Legal Fees*, JOURNAL NEWS, Dec. 21, 2010, at 1; Reid J. Epstein, *Campaign's Sky-High Price Tag*, NEWSDAY, Jan. 30, 2007, at A18; Cara Matthews, *State Lawmakers Use Campaign Money as Personal Piggybanks*, JOURNAL NEWS, Aug. 17, 2009, at 1b; Phil Reisman, *Spano Inc. is Sealed with a Kiss from Nick*, JOURNAL NEWS, Nov. 1, 2009, at 8; Phil Reisman, *Just Call Spano Mr. Lucky*, JOURNAL NEWS, Feb. 10, 2005, at B1; Bill Hughes, *Stewart-Cousins Questions Spanos' Campaign Cash*, JOURNAL NEWS, Oct. 28, 2006, at B2; *GOP Candidate Can't Hide Facts*, JOURNAL NEWS, Oct. 27, 2006, at B7; Mark Alesse, *Legislature Should Make Pork-Barrel Spending Illegal in New York State*, TIMES UNION (ALB.), Apr. 19, 2007, at A14; Donna Greene, *G.O.P. Publisher Who Insults His Own*, N.Y. TIMES, May 16, 1999, at 1; *Critics See Sun Setting on Nick Spano's Career*, JOURNAL NEWS, Nov. 4, 2004, at B1; Phil Reisman, *Nick Spano's Undoing was 4 Years in the Making*, JOURNAL NEWS, Nov. 19, 2006, at B1; Michael Gannon, *Nick Spano: Hold Off on Police Checks*, JOURNAL NEWS, Nov. 2, 2006, at A5; Phil Reisman, *Nick Spano: More than a Brother*, JOURNAL NEWS, Dec. 12, 2011; *Nick, Mike Spano Address Yonkers Corruption Probe*, JOURNAL NEWS, Jan. 9, 2012, at 5; *Nick Spano Guilty Plea is More Proof that Reform is Needed*, JOURNAL NEWS, Feb. 12, 2012; Phil Reisman, *Nick Spano Tax Charge may be Protecting Brother*, JOURNAL NEWS, Feb. 12,

2012; Michael Gannon, *Stewart-Cousins Allege Phone "Poll" a Dirty Trick by Spano*, JOURNAL NEWS, Sept. 16, 2006, at A4; Carl Campanile, *Lobbyists Cash in on Racinos' Big Bet*, N.Y. POST, Oct. 31, 2011, at 2; Jennifer Steinhauer, *For the Yonkers Raceway, Every Race Unrun Is a Winner*, N.Y. TIMES, Dec. 12, 2005, at B2; Phil Reisman, *30 Years Later, Yonkers Still Doesn't Get It*, JOURNAL NEWS, Dec. 5, 2003, at B1; Robert Borsellino, *No Zeal Like the Converts*, TIMES UNION (ALB.), Mar. 14, 1990, at A12; Phil Reisman, *Perfect Political Storm to set up Double-Spano Victory*, JOURNAL NEWS, June 8, 2006, at B1; Phil Reisman, *The "Chutzpah" of the Insane Senate Posse*, JOURNAL NEWS, June 21, 2009, at B1; Phil Reisman, *Who's Your Patriarch? Len Spano, in More Ways than One*, JOURNAL NEWS, May 15, 2005, at B1; Joseph Berger, *When County Politics is a Family Business; Westchester Feels the Spano's Presence*, N.Y. TIMES, Apr. 26, 1996, at 1; Phil Reisman, *Westchester's Rigged Game of Politics*, JOURNAL NEWS, Oct. 4, 2011, at 4a; Phil Reisman, *Yonkers Feud Helps to Spice up Dull Election Year*, JOURNAL NEWS, Mar. 6, 2003, at B1; Joe Mahoney, *The Local Sentiment: Throw 'Em Back!*, N.Y. DAILY NEWS, Nov. 3, 2004, at 22.

Thus, like most defendants who come before this Court, the defendant is neither all bad nor all good. The many letters submitted on his behalf attest to individual acts of kindness performed by the defendant on behalf of others. And there is no question that the defendant spent most of his professional career serving the public as a lawmaker.

But the defendant's career in public service cuts two ways. On the one hand, he served in public office for many years. On the other hand, as a lawmaker, he had a special obligation to adhere to the dictates of the law himself, and the

record in this case reveals that time and time again he failed to fulfill that obligation.

The defendant's willingness to break the law repeatedly by filing false tax returns time and again would be unconscionable in any case.  Here, it is especially so because the defendant was a lawmaker trusted and elected by the public to act in its best interest when he committed the crimes in question.

Thus, the defendant's "good deeds," as described in the letters submitted by the defense, provide no basis for leniency.  The defendant was an elected public official who was repeatedly elected and paid to serve his constituents.  It is not surprising or unexpected that after so many years in political life, the defendant is able to summon many letters from supporters.  That is, after all, the nature of politics and public life.  The "good deeds" described in the letters submitted to the Court describe exactly the kind of conduct to be expected from a State Senator on behalf of his constituents.

That the defendant here would offer his public service and good deeds as mitigating factors is particularly curious.  It was, after all, his position as a public official that motivated in part the crimes for which he stands convicted.  The defendant received approximately $100,000 a year in commissions from an insurance company doing business with the State of New York while

he was a sitting senator.  The defendant took extensive steps to conceal his receipt of that income -- for example, by filing false financial disclosure forms -- which undoubtedly would have given rise to great public and law enforcement scrutiny if discovered.

### b.    Collateral Business Consequences

Nor does the defendant's loss of business as a consultant provide any basis for leniency.  (PSR ¶ 70).  The fact that a defendant's conviction impacts his million-dollar consulting business is hardly unusual or surprising, and as such, this collateral consequence does not counsel leniency.

Defendant Spano's profession should not mitigate his sentence for yet another reason: it was, of course, his abuse of his very profession that led to his criminal convictions.  As discussed above, a person in his position should have had a better understanding than the average offender that he should not file false tax returns and otherwise obstruct the IRS – an understanding that should have made him think twice before he committed the offenses.

### c.    Family Circumstances

Spano's family circumstances plainly cut against leniency.  As detailed in the PSR and the defense submission, the defendant comes from a solid and supportive family background. Given the defendant's upbringing, he should have known better and

should not be shown leniency because he was born into a stable and supportive family.  Further, the collateral consequences of a Guidelines sentence on the defendant's family will be minimal. The defendant's children are grown, his wife is gainfully employed, and he has highly substantial financial assets, with a net worth totaling more than $2 million.

### 3.   Deterrence and the Need for the Sentence to Promote Respect for the Law

A Guideline sentence also is needed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  As noted above, defendant Spano's offense was very serious.  His crime was methodically carried out over an extended period of time, and it was calculated, concealed, and driven by Spano's decision to place his financial wants ahead of all else, including the public interest and the law.  A sentence at the top of the Guidelines range of 12 to 18 months is an appropriate and reasonable sentence in light of the severity of defendant Spano's conduct.

A Guidelines sentence also is required "to afford adequate deterrence to criminal conduct" by others.  18 U.S.C. § 3553(a)(2)(B).  The defendant asserts that there is no need for specific deterrence as he and his family have suffered greatly already.  But a sentence at the high end of the advisory Guidelines range is needed here to send two critical messages.

First, that public officials who misuse their office for personal
financial gain will be brought to justice.  And second, that
repeated violations of the tax laws will not be met simply with
tough talk, but with a significant term of imprisonment to deter
others who might seek to cheat the Government and the public.
*See* 18 U.S.C. § 3553(a)(2)(B).  "Taxes," wrote Oliver Wendell
Holmes in dissent, "are what we pay for civilized society...."
*Compania General de Tabacos* v. *Collector*, 275 U.S. 87, 100
(1927).  Consequently, the federal government has a vital
interest in ensuring that every taxpayer fulfills his/her
obligations to report all income (including unlawful payments)
and pay his/her fair share of federal income taxes.  "The system
of tax collection in the United States relies upon the honesty of
taxpayers.  The Government needs taxpayers to report timely,
completely, and honestly all taxes they owe so that it can
collect the taxes due.  Congress, therefore, has made it a
criminal offense to ... file a false return...."  *Modern Federal
Jury Instructions*, Sand, Instr. 59-2 (citing as authority *Sansone*
v. *United States*, 380 U.S. 343 (1965); *Spies* v. *United States*,
317 U.S. 492 (1943); *United States* v. *Robinson*, 974 F.2d 575
(1992)).

        Beyond that, the United States Sentencing Commission
has made clear that sentences in tax cases should advance the
goal of general deterrence:

21

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. Part T - Offenses Involving Taxation, *Introductory Commentary*.

As for education and work history, the defendant's education and employment history does not mean he is a lower risk of recidivism because these factors did not prevent him from committing this offense. Every offender will have committed the offense despite his or her education and employment history. In *United States* v. *Sokoya,* 313 Fed. Appx. 896 (7th Cir. 2009), the court noted that the defendant's education, employment, and reputation did not prevent him from committing the instant offense. "The court therefore has no reason to conclude that these same characteristics will prevent Sokoya from committing additional offenses." *Id.* at 899. Furthermore, about 50 percent of fraud offenders attended college. *See* U.S. Sentencing Commission, Sourcebook of Federal Sentencing Statistics, T.8 (2008), *available at* http://ftp.ussc.gov/ANNRPT/2008/Table08.pdf.

22

Spano's argument that he should be sentenced to the lowest possible term under the Guidelines flies in the face of the clear need for deterrence in tax cases, particularly when public officials are involved.  Our tax system is premised on voluntary compliance with the tax laws through deterrence.  Here, the defendant engaged in a multi-year scheme to prevent the IRS from ascertaining his true income, and the taxes due and owing thereon.  He filed numerous false tax returns, lying time and time again about his income and expenses.

A sentence at the high end of the applicable Guidelines range of 12 to 18 months will serve as a deterrent to others.

### 4.    Kinds of Sentences Available

The "kind of sentences available," 18 U.S.C. § 3553(a)(3), include imprisonment and probation, but imprisonment is plainly called for by the § 3553(a) factors.  Further, "the Guidelines' disallowance of the option of probation" while advisory, should be given "some weight."  *United States* v. *Kononchuk*, 485 F.3d 199, 205 n.4 (3d Cir. 2007); *see United States* v. *Goldberg*, 491 F.3d 668, 673 (7th Cir. 2007) ("When the Guidelines, drafted by a respected public body with access to the best knowledge and practices of penology, recommend that a defendant be sentenced to a number of years in prison, a sentence involving no ... imprisonment can be justified only by a careful, impartial weighing of the statutory sentencing factors.").

23

A careful weighing of all the factors in this case clearly demonstrates that a sentence at the top of the Guidelines range is appropriate.

### 5.   Need to Avoid Unwarranted Sentencing Disparities

Finally, imposition of a sentence within the advisory Guidelines range best serves "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In creating the Guidelines, "Congress 'sought *uniformity* in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct.'" *Rita*, 551 U.S. at 349 (internal quotation omitted). Even after *Booker*, "uniformity remains an important goal of sentencing." *Kimbrough* v. *United States*, 552 U.S. 85, 107 (2007). The Guidelines "help to 'avoid excessive sentencing disparities,'" *id.* (internal quotation omitted), because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges," *Gall*, 552 U.S. at 54, and because most defendants are sentenced within the Guidelines Range.

In this case, confronted with the proof against him, defendant Spano elected to plead guilty and signed a plea agreement (the plea agreement allows Spano to ask for a sentence of no less than 12 months in prison, of which six months must be

24

in custody but six months can be in a halfway house, and allows the Government to ask for no more than 18 months' imprisonment). In light of defendant Spano's serious criminal conduct, a sentence of 18 months is reasonable, appropriate, and would ensure that no unwarranted sentencing disparity resulted.

## III. Restitution and Fines

### A.   Restitution

The plea agreement provided for a stipulated tax loss figure and the parties have agreed that the defendant will pay a total of $45,866 in federal tax loss, which reflects the agreed-upon tax loss resulting from the offense conduct.  The defendant should be advised that to assure proper credit, each payment should be accompanied by: (1) his name and social security number; and (2) the case name and docket number.

He should also make a check payable to $13,462 for restitution to the State of New York for the outstanding New York State taxes he owes.

### B.   Fine

The Government requests that the Court consider imposing a fine within the recommended Guidelines range of $3,000 to $30,000.  The federal income tax returns filed by the defendant and the financial information he submitted to the Probation Office disclose that the defendant has ample assets and income to pay a fine.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court sentence the defendant to the top of the stipulated 12 to 18 month range, i.e., to a sentence of 18 months' imprisonment. We ask that the Court impose such a sentence to send the unmistakable message that those who are elected to make the law must first obey it themselves, and that they should not misuse their public office for the sake of advancing their own personal financial interest.

Dated:   White Plains, New York
         June 12, 2012


                         Respectfully submitted,

                         PREET BHARARA
                         United States Attorney

                    By: _____
                         Perry A. Carbone / Jason P.W. Halperin
                         Assistant United States Attorneys
                         (914) 993-1945 / 1933
                         (914) 993-1980 (fax)


c:   Richard Ware Levitt, Esq.
     Kerry Lawrence, Esq.
     (Counsel for Nicholas Spano)